HARRY PICKMAN *v.* STATE OF MARYLAND
HARRISON KNIGHT *v.* SAME
[Nos. 21, 22, April Term, 1936.]

*Decided May 19th, 1936.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Abram C. Joseph* and *Malcolm J. Coan,* with whom were *Daniel C. Joseph, Wendell D. Allen,* and *John W. Farrell,* on the brief, for the appellants.

*Hilary W. Gans, Deputy Attorney General,* with whom was *Herbert R. O'Conor, Attorney General,* for the State.

BOND, C. J., delivered the opinion of the Court.

On appeals from conviction and sentence of the appellants on charges of conspiracy to cheat and defraud customers of money paid for the purchase of securities, five rulings on offers of evidence are brought for review. No questions of fact or of legal sufficiency of the evidence to prove guilt are before this court on appeal. *Doxen v. State,* 151 Md. 118, 125, 134 A. 166; *Wolf v. State,* 143 Md. 489, 493, 504, 122 A. 641; *Luery v. State,* 116 Md. 284, 294, 81 A. 681, 685. Therefore facts need be stated only to explain the rulings reviewed.

There was evidence that the defendants, through a corporation named Harrison Knight & Co., Incorporated, engaged in a business of selling securities in Baltimore City. The corporation had no capital, except as some office equipment might be so described, and the plan of operations was to secure customers for recommended securities by solicitation on the telephone or by personal visit, and then to buy securities to fill the orders. Most of the customers bought on contracts to make installment payments, or on margin, and, according to the testimony of Pickman, this method of paying was recommended by defendants in order to secure time for their own purchases and deliveries. The purchases to fill, so far as any were attempted, were also made on credit or

margin, but there were discrepancies between the orders from customers and the efforts to fill them. During the latter part of the career of the corporation, the defendants, according to their own testimony, relied for procuring their securities only on a promise of one Goodman, or Applebaum, who came from New York to co-operate with them, but of whose ability to deliver the securities they had no assurance beyond the promise. Meanwhile, the money being received from customers was being spent liberally among those in charge or employed at the office of the corporation, and only a negligible amount of money and an inadequate amount of securities were found upon the closing of the business. This occurred on November 21st, 1934, when agents of the United States Securities Exchange Commission interfered and carried off the books and papers. In the following April the corporation passed into bankruptcy.

The first ruling to which an exception is pressed was a refusal to permit attorneys for the defendants to ask the market value of securities due to customers of the corporation at the time of closing the business or the time of the bankruptcy proceeding. An auditor called as a witness by the prosecution had testified to values given stock on the corporate books. On cross-examination, after it had been repeated that the testimony had been confined to the figures in the books, the witness was asked whether he knew the values of the stocks as of November 21st, 1934, or of the date of the bankruptcy in April, and objections to the questions were sustained, for one reason, as the court explained, because the witness was not qualified as an expert on the values of stocks. Again, a bookkeeper of the corporation was asked by the defendants for the values of stocks appearing on the date of the bankruptcy, but the court confined the time to that of the closing of business. The action is not objected to on appeal. Then the bookkeeper was asked whether he was able to tell the jury, from his examination of the values of stocks on the date of the filing of the bankruptcy petition, whether the company was solvent or insolvent.

The lack of qualification of these witnesses to place valuations on the stocks except as the books showed them was a sufficient ground for the exclusion. But the testimony also seems irrelevant. It is urged on behalf of the defendants that what they were doing in most of the transactions with customers were selling stocks short, selling them, that is, as vendors for deliveries in the future, when all installments of the purchase prices would be paid by the customers. The money paid by the customers in transactions of that nature, it is urged, would be the corporation's money, and failure to obtain and deliver the securities would give rise only to a civil action against it for damages, and could not serve as foundation for indictment and conviction of the defendants for a crime. And, according to the argument, the questions as to values were asked to show what the civil damages would be at the extreme limit of time for deliveries, either at the cessation of business or at the time of institution of the bankruptcy proceedings. But, if the contentions so far should be accepted, it would remain that, as this is a criminal proceeding, in which the jury would not assess damages, figures for assessing them would be irrelevant. It cannot be held that there was error in the court's ruling on this evidence.

A second ruling pressed was one excluding questions asked of a rebutting witness, on cross-examination, for a supposed additional part of a conversation in which, as the witness said, the defendant Pickman had made a damaging admission. Previously, on cross-examination of Pickman himself as a witness on his own behalf, he had been asked whether in a statement before the trial he had said to the state's attorney that the business carried on "was bucket shopping, because of the fact that the money was not there—the company did not have the stock—they couldn't make enough to pay our commissions of ten per cent." He denied having made exactly that statement, saying that, when asked by one of the assistants to the state's attorney whether the shop was not a bucket shop, he inquired for the questioner's defi-

nition of a bucket shop, and conceded that according to that definition it was a bucket shop. But he could not remember what that definition was. In rebuttal, a stenographer testified that Pickman had made exactly the statement on which he was first questioned. His attorney then asked the stenographer whether anything not taken down had been said in the room and whether a definition had been given by either of the state's attorneys of what they considered bucket shopping. The trial court was of opinion that the examination could not be extended beyond the verification of the previously denied statement, and sustained objections to the questions.

The situation was, then, that, while it was agreed that Pickman had termed the business bucket shopping, the definition given the term was in dispute. Pickman denied having given the meaning attributed to him, and contended that he had, instead, referred to a definition by the assistant state's attorney, and what this was, or whether it differed materially from that attributed to him, he could not or did not say. Ordinarily, he would be entitled, as he argues, to have the whole conversation said to contain anything damaging, if there was any more of it. *Niemoth v. State*, 160 Md. 544, 552, 154 A. 66. But, without the alternative definition, if there was one, and without any showing that there was some material difference in it, and that the defendant therefore may have suffered a disadvantage by its exclusion, the court cannot say there was error requiring a reversal. For that, a showing of some detriment would be necessary. *Niemoth v. State, supra; Simond v. State,* 127 Md. 29, 39, 95 A. 1073.

A third question arises from an exclusion of docket entries of a proceeding in the United States District Court and an opinion of the judge presiding, offered to show that the seizure of the corporation's books by the agents of the Securities Exchange Commission had been adjudged illegal, and the books ordered returned, as they were. The evidence would have no tendency to prove or disprove any of the questions at issue in the case, but

it was offered to offset a possible unfavorable impression on the jury from the fact of the agents' raid, as it was called. The making of the raid was not denied, and it might be doubted whether the prejudice feared could be removed by a showing that the agents making it had exceeded their legal powers in seizing the books. But it seems sufficient to say that such matter, otherwise irrelevant and inadmissible, cannot under our system be admitted to affect the jury's attitude. The scope of the inquiry cannot be enlarged for that purpose alone. *Jameson v. Hall,* 37 Md. 221, 232; *Davis v. Calvert,* 5 G. & J. 269, 304; *Marshall v. Haney,* 4 Md. 498, 510.

The fourth exception pressed is similar to the third in respect to the purpose of evidence excluded. The defendants proposed to introduce clippings from newspapers of the day after the raid referred to, proclaiming its occurrence. And the purpose was to furnish the jury an explanation of the cessation of the defendants' business other than that of lack of success or fraud. As there was no dispute of the fact of the raid and the seizure of the books at the time, necessitating a cessation of business, there would be no materiality in the clippings, unless it should be to show that the unfavorable publicity was an accentuating cause. This court concurs in the opinion that the evidence was immaterial on any ground.

The fourth exception pressed is similar to the third in a supposed admission of testimony of an auditor for the State as to the results of pencil entries made on the books of the corporation by the agents of the Securities Exchange Commission. The auditor first testified that, when he found on the books nothing but pencil entries of transactions occurring after November 21st, 1934, he disregarded them and resorted to original papers of the corporation for the facts. Later, when asked by the court whether the books on that date indicated any assets in excess of $437 deposited in banks, he answered: "Using Harrison Knight and Company's books, this pencil, the best I could get off their books themselves, they had assets, including furniture, cash on hand, and

the deposits of $1,082.01, and liabilities amounting to $20,838.23. That is taking their account." A motion to strike out the answer was denied, and the exception taken. It is not clear to this court that the witness did make up the figures from the pencil entries as supposed. The answer is somewhat confused in respect to this, but the court's construction would rather be opposed to that of defendant's attorneys. No error can be found in the admission.

In none of the rulings reviewed does the court find any error demanding a reversal and a retrial for correction.

*Judgment affirmed, with costs.*