S. DeLEON AVERY

*vs.*

STATE OF MARYLAND.

*Abortion: evidence; criminal connection with prosecutrix and*
*others. Hypothetical question: omission of any mate-*
*rial fact. Appeals: immaterial errors;*
*no reversal for—.*

In a trial on a charge of having committed an abortion upon
the prosecuting witness, the State may offer evidence tending
to prove that the traverser had had connection with her prior
to the alleged commission of the offense; but it is error for the
State to show that the traverser had had connection with other
women, either by the testimony of the prosecuting witness, or by
that of the women themselves.                           p. 231

Evidence in regard to the general character of the prosecu-
trix for truth and veracity, or for chastity, is admissible; but
not proof of specific acts which tend to show that she is an im-
moral person.                                           p. 237

There can be no reversal, on appeal, for error without in-
jury; and the Court of Appeals can not determine whether the
appellant was injured by answers to improper questions, where
the answers are not set out in the record.              p. 232

In propounding a hypothetical question to a witness who is
offered as an expert, it is error to omit any of the material facts
which might affect the opinion of the witness.          p. 236

There can be no reversal because of the refusal of the trial court to permit certain questions to be asked, where it appears that the evidence thereby sought to be introduced was ultimately admitted. p. 234

*Decided June 25th, 1913.*

Appeal from the Criminal Court of Baltimore City (ELLIOTT, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE. BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*T. C. Ruddell* and *Wm. C. Smith,* for the appellant.

*Edgar Allan Poe,* the *Attorney General* (with whom were *Wm. F. Broening* and *Roland B. Marchant* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellant in this case was convicted in the Criminal Court of Baltimore City of having committed an abortion upon Rose Gaffey, and was sentenced to confinement in the Maryland Penitentiary for the period of ten years. From that judgment he has appealed on the ground of alleged errors in the rulings of the trial Court on the evidence and in its instruction to the jury.

The first, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth exceptions are to questions asked and evidence offered for the purpose of showing that the accused had connection with another girl. In the case of *Lamb* v. *State,* 66 Md. 285, the Court quotes with

approval the statement of BAYLY, J., in *Rex* v. *Ellis,* 6 B. &
C. 145, that "Generally speaking, it is not competent to a
prosecutor to prove a man guilty of one felony, by proving
him guilty of another unconnected felony; but where several
felonies are connected together, and form part of one entire
transaction, then the one is evidence to show the character
of the other," and in the very recent case of *Meno* v. *State,*
117 Md. 435, JUDGE STOCKBRIDGE, speaking for this Court,
said: "The State attempted to prove by the witness Ludi,
that the accused had told him that he had performed opera-
tions on or treated other girls as showing a familiarity on
the part of the traverser with what could be done to rid a
woman of a child. This evidence was admitted over the
objection of counsel, and this ruling of the Court was made
the subject of the eighth exception. This evidence was
inadmissible and should have been excluded. There is a
class of cases in which evidence may be given of other sim-
ilar acts done by the accused, but this class of cases is
restricted to where the several acts are connected together
and form part of one entire scheme or transaction, so that
one of the acts forms a basis for a reasonable and proper
inference as to the purpose and intent with which the particu-
lar act was performed for which the accused was then on
trial." In the case at bar the appellant was charged with
having committed an abortion upon the prosecuting witness,
and the State had proved, or offered evidence tending to
prove, that he had connection with her prior to the commis-
sion of the alleged offense, but it was error to permit the
State to show, either by the prosecuting witness or the girl
herself, that he had connection with another girl. The
answers to the questions in the sixth and seventh exceptions,
however, are not in the record; the answer to the question in
the eleventh exception relates to the conduct of the accused
with reference to the prosecuting witness, and the twelfth
exception is to the refusal of the Court to strike out the
answer to the question in the eleventh exception. There was,

therefore, no reversible error in the rulings complained of in the four exceptions last referred to. There can be no reversal for error without injury, and this Court can not determine whether the appellant was injured by answers to improper questions unless the answers are set out in the record. The answer to the question in the eleventh exception being admissible, the rulings in the eleventh and twelfth exceptions do not constitute ground for reversal.

Counsel for the State concede in their brief that there was error in admitting the evidence referred to in the other exceptions we have mentioned, but urge that the judgment should not be reversed on that ground because the prosecuting witness stated on *cross-examination* that the accused had connection with the girl referred to in said exceptions. In her examination in chief, the prosecuting witness, when asked by the State's Attorney to state why she went to the office of the accused on a particular occasion, said she went there to have her teeth fixed, and that after he had fixed her teeth "he took Frances in another room and had connection with her." This answer was objected to by counsel for the accused and the Court ordered all after "he took Frances into another room" to be stricken out. The State's Attorney then said to the witness: "Don't tell us anything but what you know of your own knowledge—what you saw. You did not see that," and she replied, "No, sir." On cross-examination, this witness, having stated that she was at the office of the traverser about a week before Thanksgiving, she was asked by counsel for the accused, "Now, that is the time you say the doctor first had anything to do with you," and she replied, "Well, that was the first time, yes, sir; that was the first time. The first time I went up there he had something to do with Frances." Counsel for the accused interrupted her by saying, "Never mind about Frances. The Court told you not to talk about that." This is the testimony relied upon by the State to show that the admission of the evidence conceded to be inadmissible was not reversible

error. We cannot adopt that view. The prosecuting witness said that she did not see the accused have connection with Frances, and the Court, therefore, directed her statement to be stricken out, and when she repeated the statement on cross-examination, counsel for the accused cautioned her not to speak of Frances because the Court had told her not to do so. Under such circumstances it is not probable that the jury was influenced by the statement of the witness on *cross-examination,* and it cannot be held to relieve the positive and affirmative testimony of Frances herself that the accused had connection with her of its objectionable character or to deprive the accused of the benefit of the exceptions referred to.

In the course of the cross-examination, the prosecuting witness further testified that after she told her aunt that the accused had connection with her, and her aunt whipped her, he came down to her aunt's house to see the witness and her aunt. She was then asked by counsel for the accused the following questions, referred to in the second, third, fourth and fifth exceptions, to which the Court sustained the objections of the counsel for the State: "Can you tell us what the doctor said to you on that occasion?" "Didn't the doctor tell you—say something like this to you, 'Look here, Rose, I understand that you have made a statement in which you have charged me with doing something to you, and have charged me with ruining you. I want you to tell who ruined you.'" "And then when the doctor asked you that, didn't you name another person?" Having stated that she appeared "at the station house against the doctor," she was asked: "Now, you were there on Saturday, the 29th of July; what did you say about the doctor having anything to do with you to the magistrate, while you were living there employed by the family?" These questions were asked for the purpose of showing that the witness had made statements contrary to her testimony in the case, and there is no reason why she should not have been permitted to answer them. But the record shows that she did afterwards answer the questions

without objection. When asked if she did not say to the magistrate that while she was living at the doctor's house she was employed by his wife, and that during that time "the doctor didn't do anything to her at all," she replied that she did not remember. In answer to the question, "Didn't you testify to the magistrate that he hadn't anything to do with you," she said, "I told the magistrate of course, that he had something to do with me, that he ruined me," and in reply to the question, "Did you have any other conversation with 'the doctor' concerning your testimony to be given in this case," she stated that after she got the whipping her aunt gave her, the next time she went up to the doctor's she told him that she had written the paper making charges against him and that he got very angry and said to her, "I will come down to your house, and you be at home, he said; and you tell me before your aunt I never ruined you; and if they give you the paper in Court, you tear it up, and swear that Harry Deal ruined you; and I said all right; and I plead with him; and he came down to my house and I told my aunt it was not him, but Harry Deal, and that is when he talked to my aunt." As the accused ultimately secured the answers of the witness to the questions referred to in said exceptions, he was not injured by the refusal of the Court to allow them to be answered in the first instance.

The nineteenth, twentieth, twenty-first and twenty-second exceptions are to the refusal of the Court below to allow Dr. Simms and Dr. Grant to answer the following questions: "It is in evidence here on the part of a girl, Rose Gaffey, eighteen years of age—August, 1911, she was eighteen years of age—that sometime in the middle of May, 1911, nine days after she had missed, and that was the first time she had missed—a catheter was inserted by Dr. Avery. Now, assuming that that is the first time she had ever missed, could you predicate pregnancy upon the fact that she had missed and had missed her menstrual period for a period of nine days?" "The mere fact that a woman misses and has missed for a

period of nine days, can you predicate pregnancy upon the mere fact that a woman has missed for nine days?" Substantially the same questions were asked in the twenty-first and twenty-second exceptions, and the purpose of the traverser was to obtain from the witnesses their opinion whether the fact that the prosecuting witness had, for the first time "missed her menstrual period," and the further fact that she remained in that condition for nine days would indicate that she was pregnant. In addition to the facts referred to in the questions, the witness had testified that the traverser had previously had connection with her, and that on the day after he performed the operation referred to she passed a clot of blood. As no reference was made to those facts in the questions, they fall directly within the ruling of this Court in *Miller* v. *Leib,* 109 Md. 414. In that case the questions were: "Suppose a lady sixty-one years of age, rather slight, falls and sustains a fracture of the neck of the femur; suppose it were an impacted fracture; what would be the treatment which would be required on the part of a reasonably skillful physician, using reasonable care?" "How long usually would reasonable care require that the Hamilton and Long (splint) or the plaster cast and the mild extension should remain before the doctor took it off to examine the condition of the fracture?" "Suppose a lady sixty-one years of age fell and sustained an intra capsular fracture of the neck of the femur and called in her regular physician, how often would reasonable care require that he should see his patient after his first visit?" In disposing of the exceptions to these questions, the Court said: "Under these circumstances, the entire suppression of the existence of the plaintiff's tubercular trouble in the hypothetical questions to which we have referred, put to her medical expert for the purpose of proving professional ignorance or neglect of the defendant in treating her broken hip, and which elicited answers tending to such proof, was improper and the defendant's exceptions thereto should have been sustained. The sub-

sequent testimony as to the serious character of her tubercu-
lous trouble and the important bearing which such a state of
health has upon the proper treatment to be adopted with per-
sons in her condition when suffering from fractured bones,
emphasizes the importance of requiring hypothetical ques-
tions put to medical experts to be so framed as·not to give
a wrong coloring or undue importance to some of the facts
in evidence by the omission or suppression of others." What
was there said by the Court applies with equal force to this
case. The omission of any reference to the fact that the
traverser, prior to the time mentioned, had had connection
with the witness, and the further fact that after the opera-
tion was said to have been performed she passed a clot of
blood, rendered the questions misleading and fatally defec-
tive.

The remaining exceptions are to the rulings of the Court
below in permitting counsel for the State, over the objec-
tion of the traverser, to ask the wife of the traverser on
cross-examination the following questions: "Did you ever take
Frances to a house 932 Bond Street, a house kept by Nannie
Lewis?" "Now—isn't it a fact that you and a man whose
name I will not now disclose, in company with Frances
Rowley, went to 932 Bond Street and were refused admis-
sion to that house because of the age of Frances Rowley?"
The witness answered "No" to the first question and conse-
quently there was no injury to the traverser. The Court
having advised the witness that if her answer to the second
question would tend to humiliate her or subject her "to prose-
cution" she could refuse to answer, she declined to answer.
It is urged in this Court on behalf of the State that these
questions were properly allowed because the evidence elicited
was admissible for the purpose of reflecting upon the cred-
ibility of the witness. The extent to which this method of
impeaching a witness should be allowed is a question in
regard to which there is a great diversity of opinion, and
the conclusion reached in *Greenleaf on Evidence* and *Wig-*

*more on Evidence,* after a careful review of the numerous
cases, apparently favors the rule, now adopted in some of the
States, excluding it altogether. It is said in 1 *Greenleaf on
Evidence* (16th Ed.), 585: "A few courts, with courage and
wisdom, have taken the step forbidding entirely such cross-
examination to character," and in 2 *Wigmore on Evidence,*
section 983, page 1117, the author says: "There is much to
be said in favor of the rule that now obtains in several juris-
dictions by which such misconduct is forbidden to be
inquired into at all—the rule of total prohibition of cross-
examination, as well as extrinsic testimony, on these mat-
ters, has thus received sanction, and may be said to be the
one most consonant with our best sentiments and with the
needs of the time." In this State it has been repeatedly
held that a witness may be asked on cross-examination, for
the purpose of affecting his credibility, if he has been in
jail, etc. (*Smith* v. *State,* 64 Md. 25; *McLoughlin* v. *Mencke,*
80 Md. 83) and in the late case of *Mattingly* v. *Montgomery,*
106 Md. 461, where the witness drove over the plaintiff and
injured her, the Court, in a suit against his master for dam-
ages, held that he could be asked on cross-examination, if he
had been arrested and paid a fine for fast driving, for the
purpose of impairing the weight of his testimony in the
case. But in the case of *Shartzer* v. *State,* 63 Md. 149, the
Court said that the prosecuting witness in the trial of the
accused for rape could not be asked whether she had pre-
viously had connection with a man other than the prisoner,
and JUDGE ROBINSON said: "Evidence in regard to general
character of the prosecutrix for truth and veracity, or for
chastity, was admissible, but not proof of *specific acts* which
tended to show that she was an immoral person." In the
case of *Brown* v. *State,* 72 Md. 468, where the traverser was
on trial for enticing a young girl from her home for the
purpose of prostitution, the Court held that the lower Court
properly refused to allow the traverser to ask the prosecuting
witness if she did not have connection with a certain man

before she went to the house of the traverser, and in disposing of another exception, the Court said that the character for veracity of a female witness can not as a general rule be impeached by evidence of her character for chastity. In the case at bar the questions objected to in the exceptions we are now considering do not disclose the character of the house referred to, for what purpose the witness took Frances with her, or that she enticed or induced Frances to go there. So far, then, as the record shows, the questions related to an entirely irrelevant matter that did not tend to discredit the witness and was not admissible for any purpose.

The record contains what purports to be the instructions of the trial judge to the jury, and below the instructions there is a note that counsel for the traverser reserved an exception "to the ruling of the Court". The instructions are not included in the bill of exceptions; there is no certificate of the presiding judge that they are the instructions given by him, and that counsel for the traverser reserved an exception to them, and it does not appear by whom the memorandum of the exception was made. Under these circumstances the exception can not be considered by this Court.

Because of the errors referred to in the first, eighth, ninth, tenth, thirteenth, fourteenth, fifteenth and eighteenth exceptions the judgment of the Court below must be reversed.

*Judgment reversed and case remanded for a new trial.*