638 A.2d 1206

Bijal Kumar PUROHIT

v.

STATE of Maryland.

No. 868, Sept. Term, 1993.

Court of Special Appeals of Maryland.

March 31, 1994.

William E. Seekford, Towson, argued for appellant.

Tarra DeShields–Minnis, Asst. Atty. Gen., argued (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and Lawrence V. Kelly, State's Atty. for Allegany County, Cumberland, on the brief), for appellee.

Argued before BISHOP, ALPERT and WENNER, JJ.

BISHOP, Judge.

A jury in the Circuit Court for Allegany County convicted appellant, Bijal Kumar Purohit, of possession with the intent to distribute, and distribution of, obscene matter. For purposes of sentencing, the trial court merged the possession with intent charge into the distribution charge, sentenced appellant to sixty days in jail, and imposed a $750 fine. The court suspended the jail term and placed appellant on eighteen months of unsupervised probation. Appellant filed a timely notice of appeal to this Court.

## Issues

Appellant raises three issues, which we restate as follows:

I. Whether appellant was entitled to introduce, for the purpose of demonstrating contemporary community standards, videotapes of a similar nature that were distributed by local merchants.

II. Whether appellant was entitled to have the jury consider the defense of discriminatory prosecution.

III. Whether the prosecutor's remarks during closing argument necessitated a mistrial.

Discerning no error below, we shall affirm.

## Facts

Pastor D. Joseph Horevay, a representative of Christian Gathering, a Cumberland organization, wrote a letter to Allegany County State's Attorney Lawrence Kelly, expressing his concern that 104 Video, an adult video store located on Mechanic Street in Cumberland, might be in violation of state obscenity laws. Mr. Kelly met with Pastor Horevay and John Calligan, another representative of Christian Gathering, and agreed to investigate the matter.

Mr. Kelly directed the Cumberland City Police Department ("CCPD") to purchase a "homosexually oriented pornographic tape" from 104 Video. Officer Philip Houser of the CCPD

entered 104 Video, where appellant was working, and purchased a male homosexual-oriented, pornographic videotape entitled "Soap Studs." After reviewing the videotape, Mr. Kelly filed a criminal information in the circuit court.

Prior to trial, appellant served subpoenas upon Mr. Kelly, several CCPD officers (including Officer Houser), Pastor Horevay, Mr. Calligan, and a local newsperson to testify at trial for the defense. Believing that appellant would attempt to raise at trial the defense of discriminatory prosecution, the State filed a motion in limine. The State argued that, because the defense of discriminatory prosecution "is a defect in the institution of the prosecution," *see* Rule 4–252(a)(1), the court should not consider that defense as the appellant failed to file a timely motion to dismiss under Rule 4–252(b). The State also asserted that the issue of discriminatory prosecution is not within the province of the jury, and therefore, appellant should not be allowed to pursue that defense at trial.

At the motions hearing, the circuit court ruled that: (1) the defense of discriminatory prosecution is recognized in Maryland; (2) "because the defense ... does not go to the issue of the defendant's innocence or guilt or [sic] the crime charged the issue ... is not to be tried by the jury but rather to be presented to the Court by means of appropriate pre-trial motion for dismissal ..., or in the proper case by seeking injunctive relief to prevent or restrain the unconstitutional discriminatory enforcement of the law, or by seeking post-conviction habeas corpus relief"; and, (3) the presence of discriminatory prosecution is a "defect in the institution of the prosecution" that must be raised in a pre-trial motion to dismiss.

Despite appellant's failure to file a timely motion to dismiss pursuant to Rule 4–252(b), the Court determined, pursuant to Rule 4–252(a), that good cause existed to entertain appellant's motion to dismiss based on discriminatory prosecution. After a hearing at which appellant introduced evidence that other establishments in and around Cumberland distributed videotapes of a similar pornographic nature, but were not singled

out for prosecution, the court denied appellant's motion to dismiss, ruling that Mr. Kelly's decision to prosecute appellant was not based on an arbitrary or invidious criteria.

During the trial, appellant attempted to introduce six videotapes that were, assertedly, similar in nature to "Soap Studs." Defense exhibit 1 was a bag containing two videotapes obtained from Potomac Video; defense exhibit 2 was a bag containing two videotapes obtained from Kline's; and, defense exhibit 3 was a bag containing two videotapes obtained from National Video.

The appellant called James William Forbeck as a witness to testify in regard to these tapes. Mr. Forbeck testified that he visited three different establishments in the Cumberland area—Kline's, Potomac Video, and National Video—and rented two videotapes from each establishment. Mr. Forbeck acknowledged that he had an opportunity to view videotapes from the "gay section" of 104 Video and saw enough of them to know "what the gay sexual act would be." Mr. Forbeck further testified that appellant's counsel instructed him to obtain "similar materials from other establishments in the community." The following colloquy ensued:

Q Now have you had an opportunity to review any of the materials that you have here?

A Yes.

Q And did any of those materials have a male homosexual theme or conduct on it?

\* \* \* \* \* \*

A Yes.

Q And do you know where that came from?

A I'd have to look at the name of the tape.

[DEFENSE COUNSEL]: May I approach the witness to see if he can choose …

BY THE COURT: Well can we agree it came from one of the three, or is it significant which one?

[DEFENSE COUNSEL]: I would like to pin it down. Cause if I would go to offer it …

BY THE COURT: All right. Go right ahead, counsel.

Q I'll start off with one ... State's Exhibit 1 ... and see if you see if that's what they ...

A No.

Q And then it's not the one I just handed you as State's Exhibit 1 from ...

[PROSECUTOR]: Defense Exhibit 1.

Q ... Potomac Video.

BY THE COURT: Defendant's 1.

A I think it's from Kline's.

* * * * * *

Q Well we're not going to think. We're going to ...

A I'm just guessing.

Q I'm going to hand you No. 2 which came from Kline's.

A Okay.

Q Defense Exhibit No. 2 for identification.

A Yes.

Q Is it one or is it two?

A One.

Q Did you only pick up one?

A Yes.

Q Now did you have an occasion to look for or select any females homosexual or gay type?

A Yes.

Q Did you have an opportunity to locate any of those?

A Yes.

[PROSECUTOR]: Objection.

BY THE COURT: Yeah, we're ... Sustained. Sustained. I think I've permitted all I'm permitting on that.

[DEFENSE COUNSEL]: Your Honor, at this time I would move to ... (Pause) I would move to admit one tape from Kline's of the two. I would like to show ... I've shown it to counsel. I'd like to show it to the Court.

BY THE COURT: You can show it to whomever you like.

[DEFENSE COUNSEL]: This one I would withdraw as being ...

BY THE COURT: Okay.

[DEFENSE COUNSEL]: So that leaves ...

BY THE COURT: No. So I'm clear. When I say okay. I haven't ruled on any admissibility. I'm letting you ...

[DEFENSE COUNSEL]: I understand that. I just wanted to check something ...

BY THE COURT: Sure. Go right ahead, counsel.

[DEFENSE COUNSEL]: ... with regard to names.

(Pause)

Q I'm going to hand you Defense Exhibit No. 3 and ask you to review the tape upon opening without your ... You could do it. Open them up and look at the title and see if any of those two were gay males?

A No.

Q Now hand you back Defense Exhibit No. 2 from Kline's. And I've taken the liberty of putting one [tape] on the outside and one [tape] on the inside. Would you look at the one on the inside again and see if that may or may not be accurately described as male gay?

A No.

Q So then that is not ...

A No.

Q ... gay male? Now the other one in your hand, is that gay male?

A No. I'm sorry. I thought it was.

Q Huh?

A No.

Q So then do you know which one, if any, is ...

A I did not get gay tape. I got the one in gay. I call female gay too. I mean ...

Q So then ... I'd have to ...

A Sorry.

Q No, that's okay I want (unclear) That's all I wanted.

Appellant's counsel then offered the three exhibits into evidence: "At this time, Your Honor, I'd have still Exhibits 1, 2, and 3 for the Defense, which we would offer for purposes of comparables with regard to the material and its similarity to the conduct depicted in ... as determined and set out in the statute." At the time, the court did not rule on the exhibits' admissibility; after the close of appellant's case, however, the court ruled as follows:

> My conclusion is that as to the objection to their introduction I will sustain that objection. My reason or rationale is this. That to the best of my ability I have attempted to allow the Defendant latitude to generate and develop its [sic] theory of defenses, including the concept that a community standard can in part deal with what is sold at other locations. Over objection of the State, I have permitted that as I in my opinion that latitude should have been granted. However, to introduce these six items seems to me to go beyond that.
>
> First, there is a practical difficulty. While I don't know I would imagine that six videos, if they're anything of the length of what we have already observed, we're talking minimum of six hours of viewing material. It is simply a practical impossibility, as I would see it, for that to be pre-screened and/or viewed by the Jury if ultimately viewed that they should be introduced. It would seem to me it would almost prohibit trials of this case. I couldn't see where the end could come. I suppose you could have a hundred of these in that fashion. *But perhaps more significantly, it does seem to me that six different films of varieties that I can't be certain of, none of which apparently deal particularly with the subject matter of this one that's before the Court, is collateral enough and certainly in my mind raises the possibility of being not only onerous but confusing to the Jury in terms of mere quantity and quality.*

(Emphasis added).

During closing arguments, the State made the following remarks:

What else does [appellant] sell in that place? No other types of films. Does he rent them? No, he sells them. He sells them, and they go out into public. And then what happens to them? Nobody knows. They're gone. They're out there. He's putting into the public permanently this trash.

Once again, don't look at this ... And please don't ... This individual and the State is not interested in being considered prudish or in any way prejudicial or judgmental of a given sexual orientation. That is not what we are here about. What we're here about is degrading the human spirit. What we're here about is making people into animals and having candid shots ...

Appellant's counsel objected and the following was said at a bench conference:

[DEFENSE COUNSEL]: Your Honor, I'm going to move for mistrial. I want this jury. I hate to do it. I sat back there and listened to all those comments you [the prosecutor] made, degrading comments. They were not proper argument to start with. And you bring animals into the case. Highly prejudicial statement. I move for mistrial.

BY THE COURT: Okay.... I'm going to deny the motion for mistrial. The use of animal can go a different ... a couple different ways. What I would suggest, if you want to refer to that, is to make it clear you're not suggesting this is bestiality or anything.

[PROSECUTOR]: No sir.

BY THE COURT: Well I ... But that'll, you know ... And then ...

[DEFENSE COUNSEL]: Or the customers are animals.

 \* \* \* \* \* \*

BY THE COURT: Or the ... Yeah. Yeah.

[PROSECUTOR]: Nor will I refer to that.

BY THE COURT: Okay.

[DEFENSE COUNSEL]: Thank you.

Additional facts will be included in the discussion, *infra.*

### *Discussion*

#### I

 A fundamental element of due process of law is the right of a defendant to present a defense. *See Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Appellant maintains that he was denied this right. Specifically, appellant contends that the trial court committed reversible error when it sustained the State's objection to the introduction of defense exhibits one, two, and three. These videotapes, appellant asserts, were probative of the local community's tolerance for pornography and thus directly relate to the issue of "contemporary community standards." *See Mangum v. Maryland State Bd. of Censors,* 273 Md. 176, 185, 328 A.2d 283 (1974) (determination of obscenity rests, in part, on whether " 'the average person, *applying contemporary community standards,* would find that the work, taken as a whole, appeals to the prurient interest' "). The State points out that there is nothing for us to review because appellant did not make a sufficient proffer of the contents of the videotapes. We agree.

Although it had to be clear to the trial court the purpose for which appellant offered the videotapes, the contents of those videotapes were not at all clear. Appellant's counsel merely described the contents as "similar[ ] to the conduct depicted in ... as determined and set out in the statute." We assume that counsel was referring to Md.Ann.Code art. 27, § 418 (1992), the statute under which appellant was charged. That section proscribes, *inter alia,* distribution and possession with intent to distribute "obscene" matter. The term "obscene" is not defined in § 418; rather, that term is defined by case law. Thus, at best, counsel's proffer indicated that the videotapes contained conduct similar to obscene conduct.

Counsel also made reference to the fact that the proffered exhibits were comparable to "Soap Studs." The testimony of

Mr. Forbeck, however, makes clear that none of the six videotapes was of a male homosexual theme. This, of course, directly contradicts counsel's assertion that they were comparable to "Soap Studs." Without a proffer of the specific conduct that is portrayed in each of the videotapes, it is not possible for this Court to engage in an analysis of whether the lower court abused its discretion when it refused to admit the evidence. Because appellant failed to make a sufficient proffer, the issue is not preserved for appellate review. *See Mack v. State*, 300 Md. 583, 603, 479 A.2d 1344 (1984) ("[T]he question of whether the exclusion of evidence is erroneous and constitutes prejudicial error is not properly preserved for appellate review unless there has been a formal proffer of what the contents and relevance of the excluded [evidence] would have been."); *cf. Avery v. State*, 121 Md. 229, 232, 88 A. 148 (1913) ("There can be no reversal for error without injury, and this Court can not determine whether the appellant was injured by answers to improper questions unless the answers are set out in the record.").

## II

We next turn to an issue that has not heretofore been addressed by either this Court or the Court of Appeals: whether it is within the province of the jury to consider the issue of discriminatory prosecution. We shall conclude that it is not.

It is well settled that a State's Attorney's power to institute a criminal prosecution is replete with broad discretion. *See Murphy v. Yates*, 276 Md. 475, 495, 348 A.2d 837 (1975). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover,

entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Wayte v. United States,* 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985). Although prosecutorial discretion is broad, it is not unfettered. *Id.* at 608, 105 S.Ct. at 1531.

In the often-cited case of *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Supreme Court recognized that, in limited circumstances, a prosecutor's decision to prosecute can violate the equal protection clause. Justice Matthews, writing for the Court, explained:

Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

*Id.* at 373–74, 6 S.Ct. at 1073. In *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), however, the Supreme Court stated that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation"; selective prosecution must be both deliberate and "based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

The allegation of selective or discriminatory prosecution is not new to Maryland courts. Several appellate court decisions address the topic in varying contexts. *See, e.g., Bourexis v. Carroll County Narcotics Task Force,* 96 Md.App. 459, 470–71, 625 A.2d 391 (plea bargaining process), *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993); *Richardson v. State,* 89 Md.

App. 259, 270–71, 598 A.2d 1 (1991) (decision to seek the death penalty), *aff'd,* 332 Md. 94, 630 A.2d 238 (1993); *Middleton v. State,* 67 Md.App. 159, 169–72, 506 A.2d 1191 (decision to pursue mandatory sentence for a subsequent offender), *cert. denied,* 308 Md. 146, 517 A.2d 771 (1986); *In re: Laurence T.,* 285 Md. 621, 627, 403 A.2d 1256 (1979) (decision to institute juvenile delinquency proceedings); *Giant of Md., Inc. v. State's Attorney,* 267 Md. 501, 517, 298 A.2d 427 (decision to prosecute for violation of Sunday Blue Laws), *appeal dismissed,* 412 U.S. 915, 93 S.Ct. 2733, 37 L.Ed.2d 141 (1973); *cf. Pruitt v. Howard County Sheriff's Dep't,* 96 Md.App. 60, 73–75, 623 A.2d 696 (discipline against officers of Sheriff's Department), *cert. denied,* 332 Md. 143, 630 A.2d 723 (1993); *Consumer Protection Div. Office of the Attorney Gen. v. Consumer Publishing Co.,* 304 Md. 731, 751–53, 501 A.2d 48 (1985) (Attorney General's decision to file charges under the Consumer Protection Act).

In the case *sub judice,* the trial court conducted an evidentiary hearing relative to the issue of discriminatory prosecution. After hearing the evidence, the court concluded that Mr. Kelly's decision to prosecute appellant was not based on an arbitrary or invidious criteria. Appellant does not challenge that ruling; rather, he argues that he was entitled to have the jury consider the evidence and reach its own conclusion therefrom. We disagree.

The highest courts of two of our sister states have addressed this issue. In *People v. Goodman,* 31 N.Y.2d 262, 338 N.Y.S.2d 97, 101, 290 N.E.2d 139, 143 (1972), the Court of Appeals of New York held that

the claim of discriminatory enforcement should not be considered as an affirmative defense to the criminal charge, to be determined together with the issue of guilt by the trier of fact, but, rather, should be addressed to the court *before trial* as a motion to dismiss the prosecution upon constitutional grounds.

The Court cited with approval *People v. Utica Daw's Drug Co.,* 16 A.D.2d 12, 225 N.Y.S.2d 128, 131–33 (1962), wherein the New York Supreme Court, Appellate Division, explained:

The claim of discriminatory enforcement should not be treated as a defense to the criminal charge, to be tried before the jury and submitted to it for decision, but should be treated as an application to the court for a dismissal or quashing of the prosecution upon constitutional grounds. Insofar as a question of fact may be involved, the court should take the evidence in the absence of the jury and should decide the question itself. If the court finds that there was an intentional and purposeful discrimination, the court should quash the prosecution, not because the defendant is not guilty of the crime charged, but because the court, as an agency of the government, should not lend itself to a prosecution the maintenance of which would violate the constitutional rights of the defendant.

As was said in a concurring opinion by Mr. Justice Roberts speaking for himself and for Mr. Justice Brandeis and Mr. Justice Stone in a different context: "It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law * * * [It] should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention" and further: "Recognition of the defense * * * as belonging to the defendant and as raising an issue for decision by the jury called to try him upon plea of the general issue, results in the trial of a false issue wholly outside the true rule which should be applied by the courts." (Sorrells v. United States, 287 U.S. 435, 457–458 [53 S.Ct. 210, 218–19, 77 L.Ed. 413 (1932) ] ...)

\* \* \* \* \* \*

Treating the claim of discriminatory enforcement as a motion to quash the prosecution, addressed to the court, puts it in the same category as a motion to suppress illegally seized evidence under the Federal criminal procedure ... or the similar procedure now mandated in the State courts under *Mapp v. Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ]....

\* \* \* \* \* \*

[M]atters´ of this kind should be dealt with by the court rather than the jury. This places the power and the responsibility where it belongs,—in the court. The claim of discriminatory enforcement does not go to the question of the guilt or innocence of the defendant, which is within the province of the jury. The question is rather whether in a community in which there is general disregard of a particular law with the acquiescence of the public authorities, the authorities should be allowed sporadically to select a single defendant or a single class of defendants for prosecution because of personal animosity or some other illegitimate reason.... The court is asked to stop the prosecution at the threshold, not because the defendant is innocent but because the public authorities are guilty of a wrong in engaging in a course of conduct designed to discriminate unconstitutionally against the defendant.

Similarly, in *Murgia v. Municipal Court for the Bakersfield Judicial Dist.*, 15 Cal.3d 286, 124 Cal.Rptr. 204, 208 n. 4, 540 P.2d 44, 48 n. 4 (1975) (en banc) (*overruling People v. Van Randall*, 140 Cal.App.2d 771, 296 P.2d 68 (1956)), the Supreme Court of California held that an allegation of discriminatory prosecution should be raised through a pre-trial motion to dismiss and must be resolved by the court, not the jury. *See also United States v. Schmidt*, 935 F.2d 1440, 1449–50 (4th Cir.1991) (holding implicitly that the defense of selective prosecution is not triable to a jury); *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir.1973) ("The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution."); *cf. United States v. Erne*, 576 F.2d 212, 216 (9th Cir.1978) ("[A] defendant is usually entitled to an evidentiary hearing on his claim of discriminatory prosecution 'when enough facts are alleged to take the question past the frivolous stage.' "). *See generally* Comment, *The Right to Nondiscriminatory Enforcement of State Penal Laws*, 61 Colum.L.Rev. 1103, 1131–33 (1961); S.R. Shapiro, Annotation, *Preconviction Procedure for Raising Contention*

*That Enforcement of Penal Statute or Law is Unconstitutionally Discriminatory,* 4 A.L.R.3d 404 (1965 & Supp.1993).

We are persuaded that the approach taken by both the New York and California courts represents the modern view. In addition to the academic reasons for this approach cited by the New York Supreme Court, Appellate Division, in *Utica Daw's Drug Co.,* there are at least two practical ramifications worth noting. First, unlike the case of an acquittal, where double jeopardy would bar a future prosecution, dismissal of the charging document before jeopardy attaches would not bar the State from instituting a subsequent ***nondiscriminatory*** prosecution. Second, if the court grants the defendant's motion to dismiss, the State would have the right to appeal from the court's decision pursuant to Md.Cts. & Jud.Proc.Code Ann. § 12–302(c)(1) (1989) ("The State may appeal from a final judgment granting a motion to dismiss or quashing or dismissing any indictment, information, presentment, or inquisition."). If the rule were otherwise and the trial results in an acquittal, the State would be left without a forum to challenge what is essentially a constitutional appraisal of the facts, similar to a fourth amendment search and seizure issue.

Appellant cites *Medley v. State,* 52 Md.App. 225, 448 A.2d 363, *cert. denied,* 294 Md. 544 (1982), and argues that, in the case *sub judice,* there was a "dispute as to the proper interpretation of the law" that should have been submitted to the jury for resolution. In *Medley,* we recognized that Article 23 of the Maryland Declaration of Rights "requires the court to instruct the jury that its (the court's) instructions are advisory *only* in circumstances where there is a 'dispute as to the proper interpretation of the law of the crime for which there is a *sound basis.*'" *Id.,* at 237, 448 A.2d 363 (*quoting Montgomery v. State,* 292 Md. 84, 89, 437 A.2d 654 (1981)). In *Hebron v. State,* 331 Md. 219, 233, 627 A.2d 1029 (1993), the Court of Appeals stated that Article 23 "means that, although the jury is the sole judge of the facts, the jury's role with respect to the law is limited to resolving conflicting interpretations of the law

of the crime and determining whether that law should be applied in dubious factual situations." *See also In re Petition for Writ of Prohibition,* 312 Md. 280, 318, 539 A.2d 664 (1988) ("What it all boils down to now is that the jury's right to judge the law is virtually eliminated; the provision, as we have construed it, basically protects the jury's right to judge the facts."). In the case *sub judice,* however, there was no conflicting interpretation of the law; rather, there was a question of fact and law to be determined by the court, not unlike a motion to suppress illegally obtained evidence.

Accordingly, we hold that a criminal defendant who claims that the State instituted criminal proceedings in violation of the Equal Protection Clause of the Fourteenth Amendment must raise that issue pre-trial for resolution by the court. Because of its practical importance, we shall briefly discuss the proper procedure by which a defendant may raise this issue.

Rule 4–252 provides in pertinent part:

**(a) Mandatory Motions.**—In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

(1) A defect in the institution of the prosecution;

(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

(4) An unlawfully obtained admission, statement, or confession;

(5) A motion for joint or separate trial of defendants or offenses.

**(b) Time for Filing Mandatory Motions.**—A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213(c), except when discovery discloses the basis for

a motion, the motion may be filed within five days after the discovery is furnished.

"[T]he Court of Appeals in adopting new Rule 736 [the predecessor of Rule 4–252] decided, as a matter of judicial policy and administration, to make the Maryland rule parallel to Rule 12 of the Federal Rules of Criminal Procedure." *Kohr v. State,* 40 Md.App. 92, 98, 388 A.2d 1242, *cert. denied,* 283 Md. 735 (1978).

In *Schmidt, supra,* 935 F.2d at 1449, the Court of Appeals for the Fourth Circuit refused to consider whether the lower court erred in refusing to instruct the jury on the appellants' claim of selective prosecution. Instead, the Court recognized the well-settled principal that " '[d]efenses and objections based on defects in the institution of the prosecution' must be raised prior to trial" and held that the appellants' "failure to comply with the requirements of Rule 12(b)(1) [the federal counterpart to Rule 4–252(a)(1) ] constitute[d] a waiver by them of any claim that the prosecution was instituted for discriminatory reasons." *Id.* at 1450; *see also United States v. Taylor,* 562 F.2d 1345, 1356 (2d Cir.) (holding that a claim of selective prosecution is a "defense based on 'defects in the institution of the prosecution' " and must be raised in compliance with Fed.R.Crim.P. 12(b)(1)), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

Thus, it is evident that a discriminatory prosecution is a "defect in the institution of the prosecution" and therefore a claim of discriminatory prosecution must be raised in a mandatory motion to dismiss pursuant to Rule 4–252(a) within the time constraints provided by Rule 4–252(b). If this is not done, the claim is waived, "unless the court, for good cause shown, orders otherwise[.]" Rule 4–252(a). If the claim is raised properly, however, the court shall undertake to determine its merits, conducting an evidentiary hearing, if necessary.

The discriminatory prosecution issue is based on the allegation that the State's Attorney had failed to prosecute an individual who was distributing the same type of material, but

who happened to be a former client of the State's Attorney. We do not wish to let this issue pass without commenting on the following statement made by the State's Attorney in response to that allegation:

> After the charges were publicized with Mr. Purohit, Mr. Kline called me, indicated he had similar type materials, asked for my directions as to what his position would be. I indicated to him at that time ... He indicated that he was selling those type materials. I indicated that he should desist from selling. That's what Mr. Purohit was charged with. He inquired as to rentals. I indicated that at that point in time there were no prosecutions relating to those who rented, and that if at such time that occurred I would give him the courtesy of advising him. And Mr. Kline indicated to me that at any time if there was any possibility of prosecution with regard to these type materials that he would immediately remove them. He further indicated that he was going to contact certain individuals and offer for sale all of his materials.

Clearly, it was inappropriate first of all to advise a former client that he would not be prosecuted and secondly that, if a decision would be made to prosecute, he would be notified ahead of time so that he could comply with the law. There is also a question whether Kline, in fact, should have been further investigated to determine whether he should have been prosecuted for selling the materials he was handling.

### III

Appellant also argues that the trial court abused its discretion when it refused to grant a motion for mistrial after the State made two allegedly improper remarks during closing argument. In *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), the Court of Appeals reviewed the standard of appellate review of the trial court's decision to deny a motion for mistrial:

"[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. The trial judge, who hears the entire case and can weigh the danger of prejudice arising from improper testimony, is in the best position to determine if the extraordinary remedy of a mistrial is appropriate. *We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion.*

(Citations omitted) (emphasis added); *see also State v. Hawkins,* 326 Md. 270, 278, 604 A.2d 489 (1992) (the determination of prejudice is best left to the trial judge because it is he who "has his finger on the pulse of the trial").

In the context of improper remarks made during closing arguments, the Court of Appeals has made clear that " 'the mere occurrence of improper remarks does not by itself constitute reversible error.' " *Wilhelm v. State,* 272 Md. 404, 431, 326 A.2d 707 (1974) (*quoting People v. Mackins,* 17 Ill.App.3d 24, 308 N.E.2d 92, 110 (1974)). If the reviewing court can declare, " 'upon its own independent review of the record, ... a belief, beyond a reasonable doubt, that the error in no way influenced the verdict,' " such error can be deemed "harmless" and the judgment may be affirmed. *Johnson v. State,* 325 Md. 511, 520, 601 A.2d 1093 (1992) (*quoting Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)).

The first remark about which appellant complains is the State's reference to the fact that appellant sold, rather than rented, the videotape. This contention is not preserved for our review because counsel failed to object to this portion of the State's closing argument. *See* Rule 8–131(a); *Stevenson v. State,* 94 Md.App. 715, 730, 619 A.2d 155 (1993).

The second remark about which appellant complains is the State's comment that the videotape essentially "ma[de] people into animals." Assuming, without deciding, that this remark went beyond what is permissible argument, we can

conclude, based on an independent review of the record, that the error was harmless beyond a reasonable doubt.

In *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), the Supreme Court enunciated "basic guidelines for the trier of fact" when considering whether matter is obscene:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(Citation omitted). The jury in the case *sub judice* was instructed that, in order to find appellant guilty of the charges, it must be satisfied that the State proved each of the three elements beyond a reasonable doubt.

Before the State rested its case, the jury viewed "Soap Studs" in its entirety. This videotape, which is nearly ninety minutes in length, contains numerous episodes of homosexual sex between several pairs of adult males. The content of the videotape may be best described as "hard-core" pornography from beginning to end. Various deviant and unnatural sexual acts are performed throughout the tape. These "ultimate and climactic acts," *B & A Co. v. State,* 24 Md.App. 367, 372, 330 A.2d 701, *cert. denied,* 274 Md. 725 (1975), include, among others, fellatio, analingus, digital penetration of the anus, and anal intercourse. There are lewd exhibitions of the genitals and patently offensive representations of masturbation. *See Miller,* 413 U.S. at 25, 93 S.Ct. at 2615. Many of the sexual acts are videotaped close-up and at various revealing angles. Further, there are commercial-type "endorsements" for such products as "Spurts" breath mints (they "end morning breath") and "Jac-creme"; one of the actors used an "American Sex Press" credit card for payment of a male prostitute.

Based upon our review of the evidence, we hold that the State's remark regarding animals, even if improper, was

harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the circuit court.

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**